William D. Hyslop
United States Attorney
Eastern District of Washington
Meghan M. McCalla
Assistant United States Attorney
402 E. Yakima Ave., Suite 210
Yakima, WA 98901
Telephone: (509) 454-4425

FILED IN THE U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JAN 0 9 2020

SEAN F. McAVOY, CLERK
_____, DEPUTY
RICHLAND, WASHINGTON

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO:  4:19-CR-6007-SMJ-1 |
| Plaintiff, | Plea Agreement |
| vs. | Pursuant to Fed. R. Crim. P. 11(c)(1)(C) |
| ROBERT SAMUEL TILLMAN, | |
| Defendant. | |

Plaintiff United States of America, by and through William D. Hyslop, United States Attorney, Meghan M. McCalla, Assistant United States Attorney for the Eastern District of Washington, and the Defendant, ROBERT SAMUEL TILLMAN, and the Defendant's counsel, Adam Pechtel, agree to the following Plea Agreement:

//

//

//

Plea Agreement - 1

**1.     Guilty Plea and Maximum Statutory Penalties:**

The Defendant agrees to enter a plea of guilty to Count 1 of the Indictment, charging the Defendant with Conspiracy to Commit Sex Trafficking by Force, Fraud, or Coercion, in violation of 18 U.S.C. § 1594(c).

As to Count 1 of the Indictment, the Defendant understands that the maximum statutory penalty for Conspiracy to Commit Sex Trafficking by Force, Fraud, or Coercion, in violation of 18 U.S.C. § 1594(c), is a term of up to life imprisonment, a fine of up to $250,000, not less than 5 years but up to life of supervised release, a $100 special assessment, and a possible additional $5,000 special penalty assessment pursuant to the Justice for Victims of Trafficking Act of 2015 (18 U.S.C. § 3014(a)).

**2.     Fed. R. Crim. P. 11(c)(1)(C) Plea:**

The Defendant understands that this is a Plea Agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C) and that the Defendant may withdraw from this Plea Agreement if the Court imposes a sentence of imprisonment in excess of 15 years of imprisonment (180 months). The Defendant further understands that the government may withdraw from this Plea Agreement if the Court imposes a sentence of less than 15 years of imprisonment (180 months).

**3.     Sex Offender Registration:**

Defendant understands that by pleading guilty, Defendant will be required to register as a sex offender upon his release from prison as a condition of supervised release

pursuant to 18 U.S.C. §3583(d). Defendant also understands that independent of supervised release, he will be subject to federal and state sex offender registration requirements, and that those requirements may apply throughout his life. The defendant understands that he shall keep his registration current, shall notify the state sex offender registration agency or agencies of any changes to defendant's name, place of residence, employment, or student status, or other relevant information. Defendant shall comply with requirements to periodically verify in person his sex offender registration information. Defendant understands that he will be subject to possible federal and state penalties for failure to comply with any such sex offender registration requirements. If he resides in Washington State following release from prison, he will be subject to the registration requirements of RCW § 9A.44.130. Defendant further understands that, under 18 U.S.C. § 4042(c), notice will be provided to certain law enforcement agencies upon his release from confinement following conviction. As a condition of supervised release, defendant shall initially register with the state sex offender registration in Washington State, and shall also register with the state sex offender agency in any state where defendant resides, is employed, works, or is a student, as directed by the Probation Officer. The defendant shall comply with all requirements of federal and state sex offender registration laws, including the requirement to update his registration information. Defendant shall provide proof of registration to the Probation Officer within 72 hours of release from imprisonment.

### 4.    Waiver of Constitutional Rights:

The Defendant understands that by entering this plea of guilty the Defendant is knowingly and voluntarily waiving certain constitutional rights, including:

(a)    The right to a jury trial;

(b)    The right to see, hear and question the witnesses;

(c)    The right to remain silent at trial;

(d)    The right to testify at trial; and

(e)    The right to compel witnesses to testify.

While the Defendant is waiving certain constitutional rights, the Defendant understands that he retains the right to be assisted through the sentencing and any direct appeal of the conviction and sentence by an attorney, who will be appointed at no cost if the Defendant cannot afford to hire an attorney.  The Defendant also acknowledges that any pretrial motions currently pending before the Court are waived.

### 5.    Elements of the Offense:

As to Count 1 of the Indictment, the United States and the Defendant agree that in order to convict the Defendant of Conspiracy to Commit Sex Trafficking by Force, Fraud, or Coercion, in violation of 18 U.S.C. § 1594(c), the United States would have to prove beyond a reasonable doubt the following elements:

(1) First, Defendant knowingly conspired with one or more other persons to recruit, entice, harbor, transport, provide, advertise, or maintain by any means a person, to wit: Victim V, Victim W, and Victim E;

(2) Second, the Defendant committed such act knowing, or in reckless disregard of the fact, or having a reasonable opportunity to observe Victim V, Victim W, and Victim E, that means of force, threats of force, fraud, coercion, or any combination of such means, would be used to cause the person to engage in a commercial sex act and would be caused to engage in a commercial sex act; and

(3) Third, the recruiting, enticing, harboring, transporting, providing, advertising, patronizing, or maintaining was done in or affecting interstate commerce.

## 6.    Factual Basis and Statement of Facts:

The United States and Defendant stipulate and agree that the following facts are accurate; that the United States could prove these facts beyond a reasonable doubt at trial; and that these facts constitute an adequate factual basis for Defendant's guilty plea.  This statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts which are relevant to the guideline computation or sentencing, unless otherwise prohibited in this agreement.

//

//

Overview

Beginning in or about April 2018 and continuing into May 2018, Defendant Robert SAMUEL TILLMAN (hereinafter TILLMAN) conspired with individuals known and unknown, to include "Savage", co-Defendant Brandon C. CAMPBELL (hereinafter CAMPBELL), and others, to participate in the sex trafficking of Victim V, Victim W, and Victim E, in which all three victims engaged in commercial sex acts, as defined in 18 U.S.C. § 1591(e)(3), to include sexual intercourse with individuals described as "dates."

       *a. Victim V*

Around April 2, 2018, a white female with the nickname "Savage" approached Victim V in Phoenix, Arizona, and recruited her to work for TILLMAN, first as a dancer. After dancing, Victim V would turn the money over to TILLMAN or "Savage", and was told that it was being put into a savings account for her. Dancing turned into sex acts, and TILLMAN took Victim V from Arizona to St. George, Utah, then onto Wenatchee, Washington to engage in sex acts for money. TILLMAN also took Victim V to the Rodeway Inn in Pasco, Washington. TILLMAN and others used the money Victim V had made for them to pay for the hotels.

HSI agents confirmed that a Robert Tillman had a reservation at the Rodeway Inn in Pasco. The date of the reservation was April 14, 2018. TILLMAN paid with a Visa credit card. A phone number of 509-367-9250, subscribed to TILLMAN, was associated

with the reservation.  A review of TILLMAN's reservation history with Choice Hotels noted that TILLMAN made reservation at the Rodeway Inn in Pasco, WA, with an arrival date of April 11, 2018, and a departure date of April 15, 2018.  TILLMAN's phone number 602-247-1009 was associated with that reservation.  TILLMAN made additional reservations throughout the state of Washington and in Arizona during the month of April 2018.

TILLMAN would advertise Victim V on adult websites.  TILLMAN would respond to messages on his iPhone. Phone number of 509-367-9250 was used in adult ads on November 28-30, 2017, December 18-19, 2017; January 4, 5, 18, 20, 2018; and February 3 and 15, 2018; and March 8, 2018, using websites backpage.com, myproviderguide.com, skipthegames.com, and callescort.com.  Phone number 602-247-1009 was used in adult escort ads on March 24-31, April 3-4, April 30, May 10, and June 8, 2018, using websites backpage.com, myproviderguide.com, tnaboard.com, callescort, cityxguide.com, and adultlook.com.  TILLMAN gave Victim V a phone with cellular number 602-829-6103 with password "Robert."  A Google search of phone number 602-829-6103 resulted in numerous internet results for adult classifieds and escort ads with this phone number as the contact.  The ads were for locations including Phoenix, AZ, Flagstaff, AZ, St. George, UT, and Wenatchee, WA.

Victim V saw 8-10 "dates" at rate of $120 for a half hour and $200 for an hour of sex acts.  Victim V was required to give the money the "dates" gave her to TILLMAN or

others.  The online advisements, Victim V's travel from state to state, and TILLMAN's use of hotel rooms affected interstate commerce.

       *b.  Victim W and Victim E*

TILLMAN recruited Victim W into working for him.  According to one witness, TILLMAN told CAMPBELL that he (CAMPBELL) could make a lot of money by pimping out his girlfriend, Victim E; while CAMPBELL refused at first, he later brought Victim E along.

TILLMAN, CAMPBELL, and other co-conspirators used online adult webpages to advertise Victim W and Victim E for "dates," such as CityXGuide.com.  Many online advertisements from various adult webpages traced back to phone numbers associated with TILLMAN during the time period in which CAMPBELL assisted TILLMAN in sex trafficking. These online adult webpages are a means of and affect interstate commerce.

When the dates arrived, TILLMAN and/or his co-conspirators would often stay in the bathroom during the date.  The victim would take the payment and provide it to TILLMAN.  Then, the victim would either perform the sex acts or TILLMAN or his co-conspirators would come out of the bathroom and scare away the date but keep the money ("trapping").  According to one witness, TILLMAN would split the money with CAMPBELL.  Multiple witnesses described the sex trafficking operation this way.  Another witness indicated that TILLMAN would "move the girls" and CAMPBELL would guard the door.

Plea Agreement - 8

A victim described that she agreed to go on "dates," which she understood was spending time with men. She later described that the dates progressed into sexual encounters. One witness stated that the victims were forced to travel from one hotel to the next to work "dates." Hotel records from the Tri-Cities area during the course of the instant offense confirmed TILLMAN and CAMPBELL rented rooms for short stays. The use of these hotels to engage in sex trafficking implicated or affected interstate commerce. Another witness indicated that TILLMAN and CAMPBELL discussed taking the victims to the Seattle area, which was corroborated by messages found in TILLMAN's Facebook accounts. Sometimes the victims would be required to go on "out calls," meaning that they would have to leave the hotel room and meet up with the dates elsewhere.

Force, Fraud, or Coercion

During April and May 2018, TILLMAN forced Victim V, Victim W, and Victim E to prostitute seven days a week, and kept them compliant by threatening them with a gun, assaulting them, and forcing them to take drugs. TILLMAN's threats and assaults took the form of hitting, pushing, and brandishing and firing a gun.

Victim V described an incident when TILLMAN pulled a gun on her and she was forced to snort a line of meth because she was tired. After that incident, they left for Flagstaff, AZ. When Victim V expressed concerns about going with them, TILLMAN and "Savage" promised her transportation back to Arizona and an apartment for her kids,

plus money.  They never provided these items to Victim V.  While at the Rodeway Inn,

TILLMAN pulled a gun on Victim V when she became tired and did not want to work.

CAMPBELL and Victim V witnessed TILLMAN assault Victim E.  Victim V

recalled an incident in Wenatchee when TILLMAN caught Victim E keeping some of the

money after a "date."  TILLMAN hit Victim E in the jaw so hard that Victim V believed

Victim E's jaw was broken.  Victim V also recalled Tillman pulling a gun on all of them

when he became upset.  One victim described that TILLMAN would threaten to hurt her

or the other victim on a regular basis, particularly if they refused to see certain men or go

on dates.  On one occasion, TILLMAN became upset with Victim E for ruining a date

that he pulled out his gun and fired a shot out the hotel window in Wenatchee,

Washington.  On Victim W's first "date," she could not stop crying when she handed the

money over to TILLMAN.  TILLMAN, frustrated that he had to scare the customer off,

hit Victim W on the head with his gun.

Victim E's Cell Phone

TILLMAN instructed CAMPBELL to purchase a cell phone for Victim E, which

CAMPELL and TILLMAN used to stay in contact with Victim E, and TILLMAN used

to track her whereabouts.  Following an examination of Victim E's cell phone, the

following pertinent conversations were noted:

- On May 18, 2018 (timeline event 1546-1548), CAMPBELL messages
  Victim E with, "So walk in that bathroom slowly when the trick gets here."
  Victim E asks, "when is he gonna be here".  CAMPBELL responds, "1:30."
  CAMPBELL also asks, "whatever who doing the date."  Victim E responds,

"It's [Victim W's] date." CAMPBELL then asks, "When is yours"? Victim E responds, "idk [I don't know]".

- Victim E's phone also communicated under the profile named ninababyyy304 "Nina Rose." Timeline events 2166-2311 are all messages between Nina Rose and random numbers discussing hourly rates and meeting locations. During one of these message exchanges, Nina is asked what the rates are for a half hour "outcall" to Lacey. Another message (timeline event 2232) asks "Do. U. Pervide. Oral. Action. Babydoll." Timeline event 2358 is a message from Nina Rose that reads, "I had to get a room with my folks cuz they DNRd me, do you mind if they can in the bathroom? 80 is my rates for q.v.[1] and I don't offer any penetration services for that. But I can do uncovered handie[2]?"

- On May 27, 2018, a series of Facebook messages (timeline event 3033-3052) is exchanged between CAMPBELL and Victim E. CAMPBELL says, "theirs a date at the door waiting in the car." Victim E says, "I'm trying to get this one to leave," and sends another message, "He won't leave." CAMPBELL instructs her to tell the person that she is calling the police, but to not actually make the call. Victim E then sends multiple messages to CAMPBELL stating that the individual is calling the cops and he is taking her shoes. Victim E asks, "Help me," and another, "Now." In response, CAMPBELL instructs her to give the individual his money back. Victim E later sends a message to CAMPBELL, "I'm not doing these fucking dates alone anymore."

- Also on May 27, 2018, Victim E sends a message, "come knock on the door and yell something." TILLMAN asks, "it work"? Victim E messages back, "one more time," and "hurry," suggesting that she might have been in trouble/danger from the date. TILLMAN sends a message, "ok hold on just act like a girl in the bathroom," and follows up, "bc security walked by." Approximately a minute later, Victim E sends a message asking CAMPBELL for help. After additional conversation, Victim E eventually message back indicating that the date left.

---

[1] In the context of prostitution, "q.v." often stands for "quick visit," which means that the sexual encounter will be brief.

[2] In the context of prostitution, "uncovered handie" suggests a sexual act.

- On May 29, 2018, TILLMAN messages Victim E, "aye it's a date here an this bitch playing games do you want it." Victim E responds, "Yeah fosho." TILLMAN asks, "Brandon there." Victim E messages back, "I'll just do it alone idc [I don't care]." TILLMAN then says, "I'll be right outside k." TILLMAN messages that he was going to send the date to her room. Later in the conversation, TILLMAN coaches Victim E on what to say to buy herself more time if she was not ready.

In the images section of Victim E's phone, multiple "selfie" type images of Victim E and images of CAMPBELL alone and with Victim E are present. Too, images of unknown women in various stages of undress with phone numbers inserted across the images were located. Images 33 is a picture of CAMPELL and TILLMAN posing together. TILLMAN is holding two cell phones and appears to be making a gang symbol. Victim E received the photo from CAMPBELL and is captioned, "I Loook Gooodd."

The web history on Victim E's phone contains multiple visits to cityxguide.com, including visits to a login screen and sections for posting advertisements.

TILLMAN's Facebook Accounts

During a lawful execution of a search of TILLMAN's two Facebook accounts, the following evidence was found:

- On March 30, 2018, TILLMAN messages with an individual named "Kai Mula," with, "Happy birthday baby to the best bottom Bitch I could ask for half of this wouldn't have been possible without you daddy loves you."

A "bottom" girl is an individual who is the "pimp's" right hand in terms of recruiting new prostitutes; she may also continue to prostitute for the pimp.

- On March 30, 2018, Tillman sent Mula another photo with a screen shot of a text message conversation with phone number 602-829-6103—the same phone number TILLMAN gave Victim V was given. The conversation discusses payment for sexual favors. TILLMAN says to Mula, "But shit she bust all dates so I'm good with it lol." Mula and TILLMAN continue to talk about the girl. TILLMAN states, "Bitch fuck u and when I run y'all two girls u can just collect the trap and let her do everything else," suggesting that Mula would get the date and collect the money, and Victim V would perform the sex acts. Later in the conversation, TILLLMAN mentions going to St. George, UT and Wenatchee, WA, which his consistent with his travels with Victim V.

- On April 15, 2018, TILLMAN messages Victim W that she has multiple dates on that day. They discuss what appears to be pricing. Victim W states, "We'll do back to back traps." TILLMAN discusses the dates and how much money they could make, stating "If we coulda got all the dates we coulda hit for two bands tonight forsure." A "band" is believed to be $1,000.

- Also on April 15, 2018, Victim W communicated with TILLMAN about a date that was arriving. Victim W replied that Defendant was in the bathroom and another individual in the closet.

- On May 2, 2018, TILLMAN sends a message to Victim W asking her to take a topless picture of her breasts with a paper covering them, with a written message of "Kennewick" and that day's date. He told her to have another potential victim take one too. A short time later, Victim W sends a picture with Red Lion stationary attached to a female's buttocks area.

- On May 5 and May 13, 2018, Victim W and TILLMAN discuss more dates and money. At one point, Victim W states, "Ok [Victim E is] getting this one."

- On May 15, 2018, Victim W and TILLMAN discuss more dates and money. Victim W states that she does not have any condoms, so she asks if she can "trap and trick." TILLMAN says, "No you better bust it or u will fuck yourself for good," then advises that she make the date go get condoms after she collects the money.

TILLMAN also had photos of Victim E, to include on with her holding a torn piece of paper with a date and identification of the advertisement webpage (TNA Board) on which her ad could be found.  A scantily-clad photo of Victim W was also present.

* * *

On April 16, 2018, Victim V escaped the hotel room where TILLMAN and others had been arranging "dates."  She fled the room when it was empty and headed on foot towards the Pasco bus station.  A 911 caller reported a female pedestrian crossing over the blue bridge in vehicular lanes and was nearly struck several times by oncoming traffic.  WSP Trooper Carlos Mata responded to the call, and encountered Victim V midway through the bridge.  He noted Victim V appeared confused and was crying.  Later, Victim V was taken to the hospital to receive treatment for the effects of sex trafficking.  This encounter with law enforcement and medical personnel concluded Victim V's involvement with TILLMAN.

On May 29, 2018, Victim E was encountered in an undercover sting by law enforcement at the Quality Inn located at 8810 S. Hosmer St. in Tacoma, WA.  Undercover officers initiated contact by responding to an advertisement on adultlook.com (ad #2921882).  The ad had pictures (who appear to be Victim W) and described services offered by 21 year old "Lydia." "Lydia Ludacris" is one of the names Victim W was advertised under.  The ad provided a phone number: 612-254-1721.  This phone number was used to post adult ads on May 9, May 24, May 27, June 8, and June 11, 2018, using

Cityxguide.com and adultlook.com. This encounter resulted in the arrest of Victim E, and enabled Victim E to terminate TILLMAN and CAMPBELL's trafficking of her.

* * *

Beginning on or about April 2, 2018, and continuing until in or about May 29, 2018, in the Eastern District of Washington and elsewhere, Defendant ROBERT SAMUEL TILLMAN, confederated and agreed with CAMPBELL, "Savage," and other persons known and unknown, to knowingly, in or affecting interstate commerce, recruit, entice, harbor, transport, provide, obtain, advertise, and maintain by any means, persons, specifically Victim V, Victim W, and Victim E, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Victim V, Victim W, and Victim E to engage in a commercial sex act, in violation of 18 U.S.C. § 1591(a), all in violation of 18 U.S.C. § 1594(c).

**7. Waiver of Inadmissibility of Statements:**

The Defendant agrees to waive the inadmissibility of statements made in the course of plea discussions with the United States, pursuant to Fed.R.Crim.P. 11(f). This waiver shall apply if the Defendant withdraws this guilty plea or breaches this Plea Agreement. The Defendant acknowledges that any statements made by the Defendant to law enforcement agents in the course of plea discussions in this case would be admissible against the Defendant in the Government's case-in-chief if the Defendant were to

withdraw or breach this Plea Agreement. This provision would not apply to Defendant's withdrawal from the plea agreement on the basis that, pursuant to Rule 11(c)(1)(C), the sentence imposed exceeded 15 years of imprisonment.

8.      **The United States Agrees:**

(a)      Not to File Additional Charges:

The United States Attorney's Office for the Eastern District of Washington agrees not to bring any additional charges against the Defendant based upon information in its possession at the time of this Plea Agreement and arising out of Defendant's conduct involving illegal activity charged in the Indictment, unless the Defendant breaches this Plea Agreement any time before or after sentencing.

(b)      Dismissal(s):

At the time of sentencing, the United States agrees to move to dismiss Counts 2-9 of the Indictment filed on January 15, 2019.

9.      **United States Sentencing Guideline Calculations:**

The Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter "U.S.S.G.") are advisory to this case and that the Court will determine the Defendant's applicable sentencing guideline range at the time of sentencing.

(a)      Base Offense Level:

The United States and the Defendant have no agreement as to the base offense

level.

(b)    Specific Offense Characteristics:

The United States and the Defendant have no agreement as to the special offense characteristics.

(c)    Acceptance of Responsibility:

If the Defendant pleads guilty and demonstrates a recognition and an affirmative acceptance of personal responsibility for the criminal conduct; provides complete and accurate information during the sentencing process; does not commit any obstructive conduct; and accepts this Plea Agreement, the United States will the United States will move for a three (3) level downward adjustment in the offense level for the Defendant's timely acceptance of responsibility, pursuant to U.S.S.G. §3E1.1(a). The Defendant and the United States agree that the United States may at its option, and upon written notice to the Defendant, not recommend a two (2) level downward reduction for acceptance of responsibility if, prior to the imposition of sentence, the Defendant is charged or convicted of any criminal offense whatsoever or if the Defendant tests positive for any controlled substance.

(d)    Criminal History:

The United States and the Defendant understand that the Defendant's criminal history computation will be determined by the Court after review of the Presentence Investigation Report. The United States and the Defendant have made no agreement and

make no representations as to the criminal history category, which shall be determined after the Presentence Investigation Report is completed.

(e)    Departures and/or Variances:

The United States and the Defendant agree that they will move the Court at sentencing to impose a sentence of fifteen (15) years of incarceration pursuant to Fed. R. Crim. P. 11(c)(1)(C), which may result in a sentence that falls outside the guideline range calculated in this case.

**10.    Incarceration:**

The United States and Defendant stipulate and agree that both parties will recommend a sentence of imprisonment of fifteen (15) years of imprisonment (180 months).

**11.    Criminal Fine:**

The United States and the Defendant are free to make whatever recommendation concerning the imposition of a criminal fine that they believe is appropriate.

**12.    Restitution:**

The United States and the Defendant hereby stipulate and agree that, pursuant to 18 U.S.C. §§ 1593, 3663, 3663A and 3664, the Court should order the Defendant to pay restitution.  With respect to restitution, the parties agree to the following:

(a)    Restitution Amount and Interest

Pursuant to 18 U.S.C. § 1593, the Court shall order restitution for the full amount

of any victims' losses. The United States and Defendant will submit restitution information prior to sentencing. For purposes of 18 U.S.C. § 1593, "victim" is defined in 18 U.S.C. § 2259(c)(2) and means the individual harmed as a result of a commission of the crime, including, in the case of a victim who is under 18 years of age, the legal guardian of the victim, and shall in addition include the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*). The United States and Defendant also hereby stipulate and agree that the Court shall order full restitution, as appropriate, to any entity, organization, insurance company, individual(s), and/or medical provider who provided medical services and/or funds related to the treatment of identified victims. The interest on this restitution amount should be waived. Neither party may withdraw from the Plea Agreement based on the ultimate amount or restitution ordered.

> (b)    <u>Payments</u>

The parties agree the Court will set a restitution payment schedule based on his financial circumstances. See 18 U.S.C. § 3664(f)(2), (3)(A). That being said, Defendant agrees to pay not less than 10% of his net monthly income towards his restitution obligation.

> (c)    <u>Treasury Offset Program and Collection</u>

Defendant understands the Treasury Offset Program collects delinquent debts

owed to federal agencies. If applicable, the TOP may take part or all of Defendant's federal tax refund, federal retirement benefits, or other federal benefits and apply these monies to Defendant's restitution obligations. *See* 26 U.S.C. § 6402(d); 31 U.S.C. § 3720A; 31 U.S.C. § 3716.

Defendant also understands the United States may, notwithstanding the Court-imposed payment schedule, pursue other avenues to ensure the restitution obligation is satisfied, including, but not limited to, garnishment of available funds, wages, or assets. *See* 18 U.S.C. §§ 3572, 3613, and 3664(m). Nothing in this acknowledgment shall be construed to limit Defendant's ability to assert any specifically identified exemptions as provided by law, except as set forth in this Plea Agreement.

Until a fine or restitution order is paid in full, Defendant agrees fully to disclose all assets in which he has any interest or over which he exercises control, directly or indirectly, including those held by a spouse, nominee or third party. Defendant agrees to truthfully complete the Financial Disclosure Statement that will be provided by the earlier of 30 days from Defendant's signature on this plea agreement or the date of Defendant's entry of a guilty plea, sign it under penalty of perjury and provide it to both the United States Attorney's Office and the United States Probation Office. Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on Defendant upon the signing of this Plea Agreement. Until such time as the fine or restitution order is paid in full, Defendant agrees to provide waivers, consents or releases requested by the U.S.

Attorney's Office to access records to verify the financial information.

### (d)    Notifications

The Defendant agrees to notify the Court and the United States of any material change in his economic circumstances (e.g., inheritances, monetary gifts, changed employment, or income increases) that might affect his ability to pay restitution. *See* 18 U.S.C. § 3664(k). This obligation ceases when the restitution is paid-in-full.

The Defendant agrees to notify the United States of any address change within 30 days of that change. *See* 18 U.S.C. § 3612(b)(1)(F). This obligation ceases when the restitution is paid-in-full.

### 13.    **Forfeiture**:

The parties agree forfeiture applies.  *See* 18 U.S.C. § 1594(e); 28 U.S.C. § 2461(c). With respect to forfeiture, the parties agree to the following:

### (a)    Forfeitable Property

The United States shall seek a forfeiture money judgment in this matter and will not seek to forfeit specific property, except as set forth in this Plea Agreement or authorized by law. The United States will not seek to forfeit proceeds in an amount exceeding what Defendant actually obtained as a result of the crime.  *See Honeycutt v. U.S.*, 137 S. Ct. 1626 (2017).

### (b)    Money Judgment

Defendant agrees to forfeit to the United States all right, title, and interest in the

following property: a money judgment in an amount to be determined prior to or at sentencing, which represents the amount of proceeds Defendant obtained as a result of his illegal conduct.

(c)    Substitute Property

Defendant understands the United States may seek for Defendant to forfeit substitute property in satisfaction of the money judgment if the United States can establish the following regarding the above-described property (*i.e.*, the money judgment): a) it cannot be located upon the exercise of due diligence; b) it has been transferred or sold to, or deposited with, a third party; c) it has been placed beyond the Court's jurisdiction; d) it has substantially diminished in value; e) it has been commingled with other property and cannot be divided without difficulty. *See* 18 U.S.C. § 982(b)(1); 21 U.S.C. § 853(p). The United States will not seek to forfeit substitute property from other defendants or co-conspirators; it may only forfeit substitute property from Defendant. *See* 21 U.S.C. § 853(p).

(d)    Application of Forfeited Property to Restitution

Defendant understands the United States will seek restitution for the victim(s) in this case independent of this money judgment. It is the parties' mutual understanding that the United States Attorney's Office will seek approval to apply the proceeds of any forfeited assets to Defendant's restitution obligations. Defendant recognizes the final

decision to approve this application rests with the Attorney General.  *See* 18 U.S.C. § 981(d), (e); *see also* 28 C.F.R. 9 *et. seq.*

(e)    Cooperation on Forfeited Assets

Defendant agrees to cooperate with the United States in passing clear title on all forfeited assets.  Defendant also agrees to assist the United States in locating any assets that 1) are the proceeds of illegal conduct (as outlined in this Plea Agreement) and 2) have not been dissipated.  If such assets are located, then Defendant will stipulate to their forfeiture.

(f)    Waiver

Defendant agrees to waive oral pronouncement of forfeiture at the time of sentencing.  *See* Fed. R. Crim. P. 32.2(b)(4)(B).

(g)    Non-Abatement of Criminal Forfeiture

Defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive him, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement.  The forfeitability of any particular property pursuant to this agreement, including any substitute property subject to forfeiture, shall be determined as if Defendant had survived, and that determination shall be binding upon Defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed money judgment amount and substitute property subject to forfeiture in satisfaction of the money judgment, is collected in full.

**14.    Supervised Release:**

The United States and the Defendant agree to recommend that the Court impose a term of supervised release of five years.

**15.    Mandatory Special Penalty Assessment:**

The Defendant agrees to pay the $100 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, at or before sentencing, pursuant to 18 U.S.C. § 3013 and shall provide a receipt from the Clerk to the United States before sentencing as proof of this payment.

If the Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, the Defendant agrees to earn the money to pay toward these obligations by participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

**16.    Additional Violations of Law Can Void Plea Agreement:**

The Defendant and the United States agree that the United States may at its option and upon written notice to the Defendant, withdraw from this Plea Agreement or modify its recommendation for sentence if, prior to the imposition of sentence, the Defendant is charged or convicted of any criminal offense whatsoever or if the Defendant tests positive for any controlled substance.

//

//

### 17.    Appeal Rights:

The Defendant waives any right to appeal this conviction and the sentence imposed by the Court, including any restitution order.  The Defendant also waives any right to collaterally attack this conviction and sentence under 28 U.S.C. § 2255, or any other collateral attack (except for ineffective assistance of counsel based on facts discovered after the plea and sentencing).  The Defendant acknowledges that this waiver shall result in the dismissal of any appeal or collateral attack the defendant might file challenging the conviction or sentence in this case, except for ineffective assistance of counsel as noted above. If the Defendant files a notice of appeal, a habeas petition, or other collateral attack, notwithstanding this agreement, the Defendant agrees that this case shall, upon motion of the government, be remanded to the district court to determine whether Defendant is in breach of this agreement and, if so, to permit the government to withdraw from the Plea Agreement.

### 18.    Integration Clause:

The United States and the Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and the Defendant, and no other promises, agreements, or conditions exist between the United States and the Defendant concerning the resolution of the case.  This Plea Agreement is binding only upon the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state or local authorities.  The United States and the Defendant agree that

this agreement cannot be modified except in a writing that is signed by the United States and the Defendant.

## Approvals and Signatures

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

William D. Hyslop
United States Attorney

_____     1-9-2020
MEGHAN M. McCALLA                    _____
Assistant United States Attorney     Date

I have read this Plea Agreement and have carefully reviewed and discussed every part of the agreement with my attorney. I understand and voluntarily enter into this Plea Agreement. Furthermore, I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement, and no one has threatened or forced me in any way to enter into this Plea Agreement. I am agreeing to plead guilty because I am guilty.

_____     1/9/20
ROBERT SAMUEL TILLMAN               _____
Defendant                           Date

Plea Agreement - 26

I have read the Plea Agreement and have discussed the contents of the agreement with my client.  The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties.  I concur in my client's decision to plead guilty as set forth in the Plea Agreement. There is no legal reason why the Court should not accept the Defendant's plea of guilty.

_____          1-9-20
ADAM PECHTEL                                         Date
Attorney for the Defendant